UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IBRAHIM FOFANA, *et al.*,

                Petitioners,

                                Case No.: 20-10869

v.                               Honorable Gershwin A. Drain

MATTHEW ALBENCE, in his official
capacity as Acting Director, U.S.
Immigration and Customs Enforcement,
*et al.*,

                Respondents.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241 [#1], REQUIRING RESPONDENT TO RELEASE PETITIONER IBRAHIM FOFANA FROM CUSTODY WITHIN 36 HOURS AND REQUIRING RESPONDENT TO SHOW CAUSE

## I.    INTRODUCTION

On April 3, 2020, Petitioners Ibrahim Fofana, Abdulrahman Mawas, Mhdmamdouh Kheshfeh, Emilian Hila and Jurgen Sterbyci filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, along with a request for a temporary restraining order. Petitioners request their immediate release from detention while they await decisions in pending removal or asylum proceedings before the immigration courts. Petitioners are currently detained by the United States Immigration Customs and Enforcement Agency (ICE) at Monroe and

Chippewa County Jails.  Petitioners argue their continued detention violates the Fifth Amendment because Respondent Rebecca Adducci, the District Director for ICE's Detroit Office[1] and Petitioners' custodian for purposes of this habeas action, is unable to adequately respond to the COVID-19 pandemic which exposes Petitioners to a substantial risk of serious illness or death.

Respondent opposes Petitioners' requested relief arguing Petitioners are not among the class of persons considered to be high risk for serious illness or death if exposed to COVID-19, nor are any of the Petitioners housed in locations where a confirmed COVID-19 case has occurred.

For the reasons that follow, the Court will grant in part and deny in part Petitioners' petition for a writ of habeas corpus and request for a temporary restraining order.  The Court will grant Petitioner Fofana a temporary restraining order and writ of habeas corpus releasing him from ICE custody.  The Court will deny Petitioners Mawas's, Hila's, Kheshfeh's, and Sterbyci's petition for a writ of habeas corpus and request for a temporary restraining order.

---

[1] Respondent correctly notes that Rebecca Adducci is the proper respondent for the instant habeas proceeding.  As the ICE Detroit District Director, she has "power over" Petitioners.  *Roman v. Ashcroft*, 340 F.3d 314, 320 (6th Cir. 2003).

## II.    FACTUAL BACKGROUND

### A. PETITIONERS

#### 1.  Ibrahim Fofana

Petitioner Ibrahim Fofana is a 52-year old citizen of Mali, who was admitted to the United States as a non-immigrant entertainer on November 12, 1994, with authorization to remain for a temporary period not to exceed January 20, 1995. Fofana is currently married to a United States citizen and they have three minor children together.  He also has custody of another minor child from a previous marriage.  Fofana suffers from high blood pressure, swelling of the hands and legs and shortness of breath.  He is currently taking medication for his high blood pressure.

In 2000, Fofana was convicted of immigration fraud for his involvement with arranging marriages between foreign nationals and United States citizens in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. § 1546.  In March of 2001, Fofana was placed in removal proceedings based in part on his conviction for immigration fraud, and an Immigration Judge ordered his removal to Mali.  However, by October 2, 2001, Fofana was released on an order of supervision after efforts to effectuate his removal were unsuccessful.

In October of 2016, Fofana was placed in the Alternatives to Detention (ATD) program, with monthly telephonic reporting, office visits every 2 weeks,

home visits every 4 weeks, and instructions to obtain a passport.  In March of 2017, he applied to reopen his removal proceedings for an adjustment of status to lawful permanent resident based on his marriage to a United States citizen.  His motion to reopen was granted and an individual hearing on the merits of his application to adjust status is scheduled to occur on June 12, 2020.

On February 19, 2020, ICE detained Fofana pursuant to 8 U.S.C. § 1226(a) due to purported noncompliance with his ATD program requirements, including violations of telephonic reporting rules, a failed home visit on February 18, 2020, and a lack of progress in obtaining a passport as instructed.  Fofana argues that he has followed ATD reporting, however on three occasions the voice recognition system was not functioning properly.  He also insists that he failed to answer the door on February 18, 2020 because he was asleep, but when he awakened, he contacted ICE to let someone know what had happened.

### 2.  Emilian Hila

Petitioner Emilian Hila is a 29-year-old citizen of Albania, who was admitted to the United States as a nonimmigrant visitor on January 24, 2018, with authorization to remain for a temporary period until July 24, 2018.  On September 29, 2018, Hila filed an application to adjust status based on his marriage to a United States citizen.  On November 7, 2019, removal proceedings were initiated based on Hila having obtained admission to the United States by willful

misrepresentation of a material fact on a tourist visa application– namely, that he had claimed to be a priest and was attending a religious conference in Michigan. The Immigration Judge denied Hila's request for custody redetermination concluding that Hila was a flight risk with no guarantee that he "will appear for future proceedings if granted bond."   On March 11, 2020, the Immigration Judge ordered Hila's removal to Albania.  Hila appealed this decision to the BIA, and his appeal remains pending.

### 3.  Abdulrahman Mawas

Petitioner Abdulrahman Mawas is a 20-year-old citizen of Syria, who was admitted to the United States as a nonimmigrant visitor on April 16, 2016, with authorization to remain for a temporary period until October 15, 2016.  On September 6, 2016, Mawas filed an application for temporary protected status. This application was denied on April 26, 2019.

On February 13, 2017, Mawas applied for asylum and for withholding of removal which remained pending when removal proceedings were initiated and he was taken into custody on February 19, 2020.  Mawas was charged as removable for having overstayed his authorized period of admission under 8 U.S.C. § 1227(a)(1)(B).

On November 24, 2019, Mawas was arrested for shooting BB guns from his apartment balcony.  He pled guilty to an amended charge of disorderly person in

violation of MICH. COMP. LAWS § 750.167 in the 47th Judicial District Court in Farmington Hills, Michigan.  He has not been sentenced on this offense. Mawas also has prior convictions for operating a vehicle on a suspended license in September of 2018 and December of 2019.

At a hearing on March 20, 2020, the Immigration Judge denied his request for a custody redetermination, finding that he was a danger to persons and property based on his recent criminal activity.  Mawas has until April 20, 2020 to appeal this decision.  Mawas has a hearing on his application for asylum scheduled for June 11, 2020.

### 4.  Mhdmamdouh Kheshfeh

Petitioner Mhdmamdouh Kheshfeh is a 22-year-old citizen of Syria, who was admitted to the United States on a nonimmigrant visitor visa as part of a robotics team on April 16, 2016, with authorization to remain for a temporary period until October 15, 2016.  On August 24, 2016, Kheshfeh filed an application for protected status, which may still be pending.  In February of 2017, he filed an application for asylum and withholding of removal, which remained pending when removal proceedings were initiated. Kheshfeh was taken into custody on February 19, 2020.

On November 24, 2019, Kheshfeh was also arrested for shooting BB guns from his apartment balcony.  Kheshfeh and Mawas are roommates.  He likewise

pled guilty to an amended charge of disorderly person in violation of MICH. COMP.
LAWS § 750.167 in the 47th Judicial District Court in Farmington Hills, Michigan.
He has also not been sentenced on this offense.

At a hearing on March 20, 2020, the Immigration Judge denied Kheshfeh's
request for custody redetermination finding that he was a flight risk and a danger to
persons and property evidenced by his recent criminal activity.  Kheshfeh has until
April 20, 2020 to appeal this decision.  Kheshfeh has an individual hearing
scheduled on his asylum application in June of 2020.

### 5.  Jurgen Sterbyci

Sterbyci is a 30-year-old citizen of Albania who was admitted to the United
States as a visa waiver program tourist under 8 U.S.C. § 1187, on August 3, 2014.
Sterbyci gained admission by using a fraudulent Italian passport in the name of
Massimo Romanelli.  On July 29, 2015, he applied for asylum and withholding of
removal.  On December 19, 2019, the Immigration Judge ordered him removed
and he was arrested at his Macomb, Michigan residence on February 11, 2020.
Sterbyci's individual hearing for asylum and relief from removal is scheduled for
May 20, 2020.

Sterbyci is the sole breadwinner in his family and he has a 3-month old child
who is taken care of by his mother, who has also applied for immigration relief.

## B. COVID-19

COVID-19 is an abbreviation for the novel coronavirus disease of 2019, a respiratory illness that spreads easily and sustainably in the community through respiratory droplets produced when an infected person coughs or sneezes. *See Centers for Disease Control and Prevention Coronavirus Disease 2019 Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads* (last visited April 11, 2020). The novel coronavirus of 2019 "is a serious disease, ranging from no symptoms or mild ones for people at low risk, to respiratory failure and death in older patients and patients with chronic underlying conditions." ECF No. 7, PageID.121. While it is thought that people are most contagious when symptoms are present, the virus has also been detected in asymptomatic persons *See id., Centers for Disease Control and Prevention Coronavirus Disease 2019 Frequently Asked Questions, https://www.cdc.gov/coronavirus/2019-ncov/faq.html#How-COVID-19-Spreads* (last visited April 11, 2020). The incubation period is believed to be up to fourteen days in duration. *Id*.

There is no vaccine to prevent COVID-19, nor is there antitiviral medication that can treat it. *Id.* According to the CDC, "[t]he best way to prevent illness is to avoid being exposed to the virus." *Id*. The CDC recommends, among other things, that people clean their hands often or use hand sanitizer when soap is

unavailable, avoid close contact with other people (at least six feet in distance), and clean and disinfect frequently touched surfaces daily, such as tables, doorknobs, light switches, and countertops.  *Id*. The CDC also recommends that if an individual becomes sick, he or she should isolate from others by staying in a specific sick room and using a separate bathroom if possible. *Id*.

The CDC has indicated that certain classes of individuals are at higher risk for developing severe illness if exposed to the novel coronavirus of 2019.  *Id*. Older adults – 65 or older – and people suffering from underlying medical conditions such as moderate to severe asthma, chronic lung disease, serious heart disease, severe obesity, diabetes, liver disease, kidney disease or people who are immunocompromised such as those who are undergoing cancer treatment, smokers, bone marrow or organ transplant recipients or donors, people with immune deficiencies, poorly controlled HIV or AIDS sufferers and those who have prolonged use of corticosteroids and other immune weakening medications are at higher risk of developing serious illness if they are exposed to COVID-19.  *Id*.

While it has been accepted that older adults are the most vulnerable, a March 18, 2020 CDC report noted that 38% of the 508 hospitalized patients were younger – between 20 and 54 years of age. *See Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19)* United States, February 12 – March 16, 2020 (Mar. 18, 2020);https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm.

An April 8, 2020 CDC report on hospitalization rates among COVID-19 patients notes that out of the 1,482 hospital patients studied, 74.5% were aged 50 years or older and 54.4% were male. *See* Centers for Disease Control, Morbidity and Mortality Weekly Report (April 8, 2020), *Hospitalization Rates and Characteristics of Patients Hospitalized with Laboratory-Confirmed Coronavirus Disease 2019 – COVID-NET, 14 States, March 1–30, 2020*, https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6915e3-H.pdf.  Additionally, the CDC reports that "[a]pproximately 90% of hospitalized patients identified . . . had one or more underlying conditions, the most common being obesity, hypertension, chronic lung disease, diabetes mellitus, and cardiovascular disease." *Id.*

The swift and stunning spread of the novel coronavirus of 2019 has changed the world in record speed.  At the time of writing, the majority of states have issued stay at home orders, including Governor Gretchen Whitmer of Michigan, who issued a state of emergency when the State's first two cases of coronavirus were reported on March 10, 2020.  On March 24, 2020, Governor Whitmer issued a stay-at-home order requiring all but essential workers to report to work.  All primary and secondary schools, as well as colleges and universities have shuttered. Dining at restaurants is prohibited and retailers, small businesses included, have closed doors unless they sell "essential" merchandise.

Moreover, even with the Governor's stay-at-home order, Michigan continues to experience staggering numbers of confirmed COVID-19 cases and deaths.  On April 9, 2020, Governor Whitmer extended the stay-at-home order through May 1, 2020.  At the time of this writing, a little more than thirty days after the initial two COVID-19 cases were reported in Michigan, the total confirmed number of COVID-19 cases now totals 27,001, with 1,768 lives lost. Those that have died range in age from 20 to 107.  The United States alone accounts for 614,180 confirmed COVID-19 cases representing roughly 25% of the total cases worldwide at 1,981,239.  Since the virus was first reported on January 21, 2020 by a Washington State man, the United States has lost 26,061 lives to COVID-19.

## C.    MONROE & CHIPPEWA COUNTY JAILS

Immigration detention facilities and jails are enclosed environments that the CDC has acknowledged "present[] unique challenges for control of COVID-19 transmission among []detained persons, staff, and visitors."  ECF No. 1, PageID.4. Another court reviewing a similar habeas petition has noted that "[c]ounty jails were not designed with pandemics in mind.  To the contrary, they were made to house persons in relatively close contact."  *Rafael L.O. v. Tsoukaris*, No. 20-3841 (JMV), 2020 U.S. Dist. LEXIS 62389, *7 (D.N.J. Apr. 9, 2020).

Petitioners Fofana, Mawas, Kheshfeh, and Sterbyci are detained at the Monroe County Jail.  Petitioner Hila is detained at the Chippewa County Jail.  The Petitioners maintain that the conditions of confinement at Monroe and Chippewa County Jails make it impossible for Respondent to protect the Petitioners from risk of COVID-19 infection.  Respondent argues that there are no confirmed cases in either facility, thus Petitioners should be denied relief on this basis alone.

COVID-19 has already entered some of Michigan's jails and prisons and begun to wreak havoc therein. Jackson County's Parnell Correctional Facility has the most confirmed COVID-19 cases with 144.  A total of 454 inmates in MDOC custody, including 10 deaths, have tested positive for COVID-19.  ICE detention facilities, including county jails, had at least 13 confirmed COVID-19 cases as of April 4, 2010.  *See* ICE Guidance on COVID-19, U.S. Immigration and Customs Enforcement, https://wwww.ice.gov/coronavirus (updated Apr. 4, 2020).  As of the date of this writing, roughly a week and a half later, that number has increased to 77 COVID-19 cases among the nation's immigrant detainees.  *Id.* (updated Apr. 11, 2020).   This number is likely lower than the actual number as access to testing for COVID-19 has been difficult across the United States, including in Michigan.

James Jacobs is an Assistant Field Office Director with the Detroit Field Office of Enforcement and Removal Operations with ICE.  While Jacobs has

oversight over detention facility matters, he has not personally visited either Monroe County Jail or Chippewa County Jail. ECF No.9, PageID.243.

Jacobs indicates that the Monroe facility houses immigration detainees in POD B, which has a capacity of 95 detainees.  ECF No.9, PageID.243.  Jacobs claims that the facility is at half capacity and is not accepting new detainees.  *Id.* POD B's housing unit aligns bunks in rows with beds roughly two feet apart. *Id.* Staff have assigned detainees to bunks with empty bunks separating them from the next detainee. *Id.* Detainees eat in the housing unit at tables with 4 to 6 inmates per table.  *Id.*  Jacobs asserts that inmates have daily access to sick calls in a clinical setting.  *Id.*  Monroe County Jail does not have an onsite medical infirmary.  *Id.*

Contrary to Jacobs' claims, Petitioner Fofana maintains that the medical care at the Monroe County facility has been substandard. ECF No. 11, PageID.287. Fofana has high blood pressure and he began experiencing symptoms on February 28, 2020 when he awoke in the middle of the night feeling ill. *Id.*  Fofana sent a kite to see a doctor, but his request was not fulfilled until March 23, 2020.  *Id.* From that date on, a nurse irregularly monitored Fofana's blood pressure.  *Id.*   On April 2, 2020, he was prescribed 2 medications for his high blood pressure.  *Id.* A doctor finally examined him on April 8, 2020 and adjusted the dosage of his blood pressure medication.  *Id.* Petitioner Fofana continues to feel unwell.  Most recently,

he asked the nurse to take his blood pressure and she refused, stating, "we only take blood pressure once a week." *Id.*

Jacobs further indicates that the Monroe County Jail has increased sanitation frequency with daily sanitation of the building and housing units. The facility uses a mobile Kaivac cleaning system with disinfectant cleaner. He notes that detainees are provided soap, Lysol wipes and cleaning solution for cleaning their assigned sleeping areas. He further asserts that masks are available as needed. Monroe County Jail has identified housing units for quarantine of patients who are suspected of, or test positive for, COVID-19. ICE detainees requiring segregation or quarantine will be moved from their separate housing unit in the dormitory to the main jail.

Conversely, Petitioner Sterbyci asserts that people who are sick and coughing continue to remain in his housing unit. ECF No.11, PageID.290. He notes the shared bathroom facilities are moldy and the detainees are only given water, soap and a bucket to clean with. *Id*. Detainees deny access to Lysol wipes. *Id*. Jail trustees from Pod A enter the Petitioners' unit and do not wear masks or gloves. *Id*. Petitioner Khesfeh maintains that detainees who are sick must place a request to see a nurse, which usually takes about 24 hours. *Id*., PageID.292. He notes that detainees who have been coughing in his unit were removed for a period of two days and returned. *Id*.

Jacobs also advises that Chippewa County Jail has a detainee population within its approved capacity. Detainees are housed in 24-man cells with bunk beds spaced between 31" and 38" apart.  Chippewa County Jail has also increased sanitation frequency, with additional workers sanitizing and disinfecting throughout the day and night.  Detainees are provided personal soap, hygiene items, and disinfectant supplies for cleaning their assigned sleeping areas. Detainees must share two sinks and showers.

Jacobs asserts that detainees at Chippewa County Jail have access to daily sick calls in a clinical setting. Chippewa likewise does not have a medical infirmary.  As of March 25, 2020, all new detainees are screened when they enter the facility, including questions concerning travel history, contact with confirmed COVID-19 cases, and taking detainees' temperatures.

In support of their petition and motion for temporary restraining order, Petitioners have included the declaration of Dr. Robert B. Greifinger, a 30-year physician specializing in health care for prisoners.  ECF No. 7, PageID.121.  In a separate case, Dr. Greifinger was asked to evaluate ICE's response to COVID-19 in another detention facility in Michigan – Calhoun County Detention Center – which has implemented similar measures to those implemented by ICE at the Monroe and Chippewa County Jails.  Dr. Greifinger concluded that ICE's "protocols are wholly insufficient to adequately face the crisis[.]"  *Id.*  Dr.

Greifinger opined that ICE "must release all people with risk factors to prevent serious illness including death." *Id*. Dr. Greifinger also indicated that release of the most vulnerable will reduce the burden on the facilities' limited healthcare infrastructure. *Id*. Also noteworthy is Dr. Greifinger's opinion that isolation for suspected COVID-19 cases is not a medically appropriate method for abating the substantial risks of COVID-19. Detainees in isolation are monitored less frequently, and COVID-19 can cause severe symptoms that escalate in a short amount of time placing detainees in serious and grave danger. *Id.*

### III.   LAW & ANALYSIS

#### A. Standard of Review for Temporary Restraining Order

In order to prevail on a motion for injunctive relief, Petitioners must demonstrate that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) the relief sought is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

#### B. Likelihood of Success on the Merits

#### 1. Standing

As an initial matter, Respondent argues that Petitioners lack standing to bring the instant action. "Before bringing a case in federal court, a plaintiff must establish standing to do so." *Klein v. United States DOE*, 753 F.3d 576, 579 (6th

Cir. 2014).  The law of Article III standing "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Id.*  (citing *Clapper v. Amnesty Int'l USA*, 133 S.Ct. 1138, 1146, 185 L. Ed. 2d 254 (2013)).

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likelihood' that the injury 'will be redressed by favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334, 2341, 189 L.Ed. 2d 246 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).

"An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* (quoting *Lujan*, 504 U.S. at 560).  "An allegation of future injury may suffice if the injury is 'certainly impending,' or there is a 'substantial risk that harm will occur.'" *Id.* (quoting *Clapper*, 133 S. Ct. at 1148).  "Redressability is a likelihood that the requested relief will redress the alleged injury."  *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 659 (6th Cir. 2007) (internal quotation and citation omitted).

Respondent argues that Petitioners cannot show an injury in fact because their claim that detention *per se* poses an increased risk of contracting COVID-19 is purely speculative; the virus is not in either facility.   Additionally, Respondent

has taken adequate measures to respond to the pandemic.  Moreover, only

Petitioner Fofana complains of any underlying health condition – high blood

pressure – and this is not one of the conditions listed by the CDC that increases the

risk of serious illness from COVID-19. Nor does Petitioner Fofana's age put him

in the class of persons at higher risk.  Finally, Respondent complains that the

remaining Petitioners have no underlying health conditions and they are all young

– in their twenties or early thirties.

Respondent's argument is foreclosed by the Supreme Court's decision in

*Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475, 125 L. Ed. 2d 22 (1993).

Contrary to Respondent's contention, "a remedy for unsafe conditions need not

await a tragic event." *Id*. at 33-34.  In *Helling*, the Supreme Court held that a

prisoner could allege a valid Eighth Amendment claim when prison officials

exposed him to an unreasonable risk of serious damage to his future health by

exposing him to environmental tobacco smoke.  *Id*. at 28 (concluding that

deliberate indifference can be established where prison officials "ignore a

condition of confinement that is sure or very likely to cause serious illness and

needless suffering the next week or month or year").  *Id*.  The *Helling* court

explained that in *Hutto v. Finney*, 437 U.S. 678, 682 (1978):

> [W]e noted that inmates in punitive isolation were crowded into cells
> and that some of them had infectious maladies such as hepatitis and
> venereal disease.  This was one of the prison conditions for which the
> Eighth Amendment required a remedy, even though the possible

> infection might not affect all of those exposed.  We would think that a
> prison inmate also could successfully complain about demonstrably
> unsafe drinking water without waiting for an attack of dysentery.

*Id.* at 33-34; *see also Gates v. Collier*, 501 F.2d 1291 (5th Cir. 1974) (concluding

that inmates were entitled to Eighth Amendment relief when they established

threats to their personal safety from, among other conditions, "the mingling of

inmates with serious contagious diseases with other prison inmates.").

Accordingly, Petitioners do not need to allege that the jails currently have

confirmed COVID-19 cases or that they have contracted the virus to demonstrate

standing.   It is well documented that detention facilities increase the risk of

contracting infectious diseases because of the inherent nature of confinement.  As

will be more fully discussed below, Respondent has not undertaken adequate

measures to protect Petitioners from the risk of serious illness or death from

exposure to COVID-19.  The Constitution does not require that Petitioners be

seriously ill from COVID-19, or that they await the introduction and spread of

COVID-19 in their detention facility before they may assert their Fifth Amendment

rights.  Respondent's standing argument lacks merit.

### 2.  Fifth Amendment Due Process

Respondent also argues Petitioners cannot establish a Fifth Amendment

violation because they cannot show ICE has failed to undertake adequate measures

to prevent the spread of COVID-19, or that Respondent has allowed dangerous

conditions to persist at these facilities.  Respondent contends that Petitioners

cannot show release from these facilities, which do not have any cases, into the

general population where the COVID-19 virus is spreading, will reduce the risk of

contracting the virus.

The Fifth Amendment's Due Process Clause applies to "all 'persons' within

the United States, including aliens, whether their presence here is lawful, unlawful,

temporary or permanent." *Zadvyas v. Davis*, 533 U.S. 678, 693 (2001).  The Sixth

Circuit has recognized that the government "has an 'obligation to provide medical

care for those whom it is punishing by incarceration.'"  *Rhinehart v. Scutt*, 894

F.3d 721, 737 (6th Cir. 2018) (quoting *Estelle v. Gamble*, 429 U.S. 97, 103

(1976)).  In order to establish their Fifth Amendment claim, Petitioners must

establish a subjective and objective component.  *Villegas v. Metro. Gov't of*

*Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); *see also Watkins v. City of Battle*

*Creek*, 273 F.3d 682, 685-86 (6th Cir. 2001) (claims relating to health concerns of

detainees are governed by the Eighth Amendment's deliberate indifference

standard).

Petitioners must establish that Respondent is deliberately indifferent to a

substantial risk of harm to Petitioners.  *Farmer v. Brennan*, 511 U.S. 825, 837-38

(1994).  In this regard, Petitioners must show that the constitutional deprivation

was "objectively, 'sufficiently serious'" and that the Respondent's "current attitude and conduct amount[s] to deliberate indifference."  *Id*.; *Helling*, 509 U.S. at 35.

Petitioners have satisfied the subjective prong.  Respondent is aware of the problems posed by institutional confinement and the novel coronavirus of 2019 and has failed to take adequate steps to reduce the risk that Petitioners are exposed to serious harm. "The Government cannot act with a callous disregard for the safety of our fellow human beings." *Castillo v. Barr*, No. 20-00605, 2020 U.S. Dist. LEXIS 5425 (W.D. Cal. Mar. 27, 2020).

The Court acknowledges that Respondent has taken some steps to address the COVID-19 pandemic.[2]  However, as recognized by Dr. Greifinger with respect to Respondent and the Calhoun County Jail, Respondent's precautionary measures at Monroe and Chippewa County Jails are "wholly insufficient to adequately face the crisis at hand."  ECF No.7, PageID.123.   The detainees eat 4 to 6 people per table.  While Monroe County Jail has ceased accepting new detainees and is operating at half capacity, roughly 48 detainees are confined to one housing unit. This violates recommended guidelines to socially distance with at least six feet distance between people and for no more than ten people to gather in one space. *See Awshana v. Aducci*, No. 20-10699, 2020 U.S. Dist. LEXIS 62415, *24 (E.D.

---

[2] It is problematic that the only evidence offered from the Government concerning the jails' condition is from ICE employees who have no personal knowledge of the jails' current condition because they have not been there.  This is the subject of Petitioners' Motion to Strike. *See* ECF No. 12.

Mich. Apr. 9, 2020) ("[W]hile these measures are certainly commendable, 'the fact is that none of the steps [taken] . . . includes the 'social distancing measures recommended—especially for high-risk individuals—by the CDC . . .'") (quoting *Jones v. Wolf*, No. 20-361, 2020 WL 1643857 (W.D.N.Y. Apr. 2, 2000)).

Additionally, Monroe County Jail is ill equipped to address a COVID-19 outbreak with substandard medical care and supervision.  Respondent's contention that Petitioners have access to more medical monitoring than the general public is without basis in the record.  Dr. Greifinger, a thirty-year veteran of medical care in the penological setting, indicates that detention facilities are ill suited to attend to the medical needs of detainees should a communicable disease be introduced into the facility.  This is evident by not only the facility's lack of an infirmary, but also by Petitioner Fofana, who sought a doctor on February 28, 2020, but was not seen by a doctor and prescribed needed high blood pressure medication until early April.  Monroe County Jail's failure to take sufficient precautions is also evidenced by the lack of enough quarantine rooms for sick detainees so that sick and coughing detainees can be separated from Petitioners.

While Monroe County Jail has apparently increased cleaning, it does not appear that the shared bathroom facilities are cleaned frequently throughout the day as recommended.  Moreover, jail staff are permitted to freely walk between the main jail and the unit where Petitioners are housed.

Chippewa County Jail also cannot adequately protect Petitioner Hila from COVID-19.  It is still accepting new detainees, however contrary to recommendations, these new detainees are not quarantined from the rest of the detainee population for a period of 14 days.  Because persons with the virus may be asymptomatic, "nearly everyone who is not practicing social distancing is in contact with someone who has the virus."  ECF No. 7, PageID.123.  As such, new detainees may bring the virus into the facility and spread the virus to Petitioner Hila.  Chippewa County Jail likewise lacks an infirmary to treat detainees.  Respondent also fails to indicate how many ICE detainees are held at the jail, and how many people are in Hila's cell, which holds up to 24 people.  Respondent merely indicates the "[j]ail has a population within its approved capacity and is not overcrowded."  ECF No. 9, PageID.250.  This information is unhelpful to the Court's analysis as another district court has recognized, "the appropriate capacity of a jail during a pandemic obviously differs enormously from its appropriate capacity under ordinary circumstances."  *Banker*, 2020 U.S. Dist. LEXIS 53191, *6.

It is also notable that Respondent is silent as to how many, if any, detainees have been tested for COVID-19 in the Monroe County and Chippewa County Jails.  It is well documented that access to testing for COVID-19 has been difficult.  The

MDOC has only tested 707 inmates, with 454 testing positive for the virus, and a total inmate population of more than 40,000.

While it appears that Petitioners can easily satisfy the objective prong, Fofana's case is markedly stronger than the other Petitioners. Fofana is a 52-year-old male with high blood pressure. Fofana falls in the category of persons who are at risk of serious illness and potential death if exposed to the novel coronavirus of 2019.

Respondent improperly minimizes the seriousness of the risk to Fofana by arguing he does not have the characteristics that put him in a high-risk category. While the CDC has noted that persons 65 years and older are at greater risk for serious complications, it has also produced a report noting that younger individuals are at risk for serious illness as well. Numerous medical professionals have indicated that adults over 50 years old, especially those with underlying health conditions, are likely to suffer serious illness. A CDC study of hospitalization rates reported on April 8, 2020 revealed that 74% of hospitalized patients were aged 50 years old or older, 54.4% were male and 49.7% had hypertension.

Additionally, the lack of adequate medical care for Fofana further supports his claim. He waited more than a month to be prescribed needed high blood pressure medication and his requests for continued monitoring by nursing staff have been ignored. Thus, contrary to Respondent's argument, Petitioner Fofana

has established Respondent is deliberately indifferent to Fofana's serious risk of illness and death from exposure to COVID-19 by her failure to impose adequate precautions and ensure proper healthcare for Fofana.   Petitioner Fofana is likely to succeed on the merits of his Fifth Amendment claim.

As to Petitioners Mawas, Kheshfeh, Hila and Sterbyci, the Court lacks evidence that they suffer from any underlying medical condition or conditions that place them at high risk for serious illness if exposed to COVID-19.   Moreover, Petitioners Mawas, Kheshfeh, Hila and Sterbyci are in their twenties and thirties, respectively.  Without more evidence to support the objective prong of their Fifth Amendment claim, the Court cannot conclude that Petitioners Mawas, Kheshfeh, Hila and Sterbyci have a strong likelihood of success on the merits of their Fifth Amendment claim.

### C. Irreparable Injury

Respondent also argues Petitioners cannot show irreparable injury because release will not prevent the risk of adverse consequences from COVID-19 when neither prison has any confirmed cases.   Contrary to Respondent's argument, it is beyond dispute that detention facilities are built to house as many people as possible, which makes it virtually a guarantee that these facilities "will be hit by COVID-19 when the rest of the community is, staff and their families included." ECF No. 7, PageID.123; *see also Rafael L.O.*, 2020 U.S. Dist. LEXIS 62389, at *7

(granting immigration detainees release because the "conditions of confinement raise serious concerns about the ability to stop transmission of the virus.")  As another federal judge in this district stated, "[i]n the face of a deadly pandemic with no vaccine, no cure, limited testing capacity, and the ability to spread quickly through asymptomatic human vectors, a 'generalized risk' is a 'substantial risk' of caching the COVID-19 virus for any group of human beings in highly confined conditions, such as" Petitioners at Monroe and Chippewa County Jails.  *Malam v. Adducci*, No. 20-10829, 2020 U.S. Dist. LEXIS 59709, *25 (E.D. Mich. Apr. 6, 2020).

The only legitimate governmental objective advanced by Respondent is the Government's interest in ensuring illegal aliens do not abscond into the United States and evade their immigration proceedings.  However, Petitioners have a strong interest in avoiding an unreasonable risk of serious illness and damage to their future health.  None of the Petitioners are subject to mandatory detention under 8 U.S.C. § 1226(c).  Continued confinement under these conditions is not reasonably related to the Government's interest.  *See Malam*, 2020 U.S. Dist. LEXIS 59709 (E.D. Mich. Apr. 6, 2020) (finding irreparable harm where petitioner with underlying health conditions was housed at a facility with no confirmed COVID-19 cases but that had imposed measures that were "insufficient to stem deadly prison outbreaks" based on the inherent nature of detention and "this

particular global public health crisis."); *see also Thakkur v. Doll*, No. 1:20-cv-480, 2020 U.S. Dist. LEXIS 59459, *24 (M.D. Pa. Mar. 31, 2020) ("unsanitary conditions, which include overcrowding and a high risk of COVID-19 transmission" are not rationally related to government objective of ensuring that the petitioners appear for removal proceedings).

In *Thakkur*, the district judge determined the "[p]etitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions." *Id.* at *9. He further opined that, "[a]t this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein." (emphasis in original). "There can be no injury more irreparable" than "lasting illness or death." *Id.* The *Thakkur* court ultimately released more than ten immigrant detainees including several in their fifties with underlying health conditions such as high blood pressure. *Id.*; *see also Castillo v. Barr*, No. 20-00605, 2020 U.S. Dist. LEXIS 54425 (C.D. Cal. 2020) (releasing immigrant detainees due to COVID-19 pandemic and the respondent's deliberate indifference to the detainees exposure to the virus and irreparable, serious illness); *Rafael L.O.*, 2020 U.S. Dist. LEXIS 62389, at *23 (same); *Basank v. Decker*, No. 20 Civ. 2518, 2020 U.S. Dist. LEXIS 53191 (S.D.N.Y. Mar. 26, 2020) (same).

The record is replete with evidence that Respondent has exposed Petitioners to a serious risk of harm. Given the accelerating count of confirmed COVID-19 cases in ICE detention facilities throughout the nation and Respondent's inadequate precautionary measures, as discussed above, Respondent has exposed the Petitioners to risk of serious and irreparable harm.

### D. Balance of Interests

Because the government's interest is the public's interest, the final factors for injunctive relief are considered together because "'the government's interest is the public interest.'" *Malam*, 2020 U.S. Dist. LEXIS 59709, at * 36 (quoting *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 512, 425 U.S. App. D.C. 31 (D.C. Cir. 2016)(citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).   Respondent argues the balance of factors does not favor the Petitioners.  The public has a significant interest in the enforcement of the immigration laws and Respondent has valid reasons and statutory bases for detaining the Petitioners.  Moreover, Petitioners Hila and Fofana have already been declared flight risks.

Contrary to Respondent's argument, the balance of interests favor release. The public has a strong interest in preventing the rapid spread of COVID-19 in immigration detention facilities so that sick detainees do not place further strain on an already taxed healthcare system. *Thakkur*, 2020 U.S. Dist. LEXIS, at *27

("Efforts to stop the spread of COVID-19 and promote public health are clearly in the public's best interest.")

As to Petitioner Fofana, the likelihood that he would abscond appears minimal considering the current restrictions in the State and that he is a married father of four minor children with every incentive to appear for his immigration proceedings. Finally, the Court notes that Fofana has lived in the United States from 2001 through February of this year and has not engaged in further criminal conduct. In an abundance of caution; however, the Court will order ICE to set up electronic monitoring for Petitioner Fofana, among additional conditions of release.

Because Petitioner Fofana has a strong likelihood of success on the merits of his Fifth Amendment claim, has shown irreparable injury and the balance of interests are in his favor, the Court will grant his requested relief.

As to Petitioners Mawas, Khesfeh, Hila and Sterbyci, the Court is without sufficient information to assess whether they can establish a likelihood of success on the merits of their Fifth Amendment claim.  The entry of preliminary injunctive relief is an extraordinary remedy and the Court cannot conclude at this juncture that Petitioners Mawas, Khesfeh, Hila and Sterbyci have met their burden to justify their requested relief. *Am. Civil Liberties Union Fund of Michigan v. Livingston Cty.*, 796 F.3d 636, 642 (6th Cir. 2015).

## IV. CONCLUSION

Accordingly, for the reasons articulated above, Petitioners' Petition for a Writ of Habeas Corpus and Request for Temporary Restraining Order [#1] is GRANTED IN PART and DENIED IN PART.

IT IS ORDERED that Respondent Rebecca Adducci, within 36 hours from the entry of this Opinion and Order, release Petitioner Fofana on his own recognizance with the conditions that he (1) quarantine for 14 days at home upon his release from custody, (2) obey all Michigan Executive Orders, and (3) appear for his immigration proceedings.

IT IS FURTHER ORDERED that Respondent is RESTRAINED from arresting Petitioner Fofana for civil immigration purposes until the State of Emergency related to COVID-19 is lifted or until further Order of this Court.

IT IS FURTHER ORDERED that Petitioner Fofana submit to electronic monitoring by ICE.

IT IS FURTHER ORDERED that Petitioners Mawas's, Khesfeh's, Hila's and Sterbyci's petition for a writ of habeas corpus and request for a temporary restraining order is denied.

IT IS FURTHER ORDERED that this temporary restraining order will expire within fourteen days of the entry of this Opinion and Order. Respondent SHALL SHOW CAUSE, in writing, why this Opinion and Order granting

Petitioner Fofana's request for a temporary restraining order should not be converted to a preliminary injunction <u>no later than April 20, 2020</u>.  Petitioner Fofana may file a Response <u>no later than April 23, 2020</u>.

      SO ORDERED.

Dated:  April 15, 2020               <u>/s/Gershwin A. Drain</u>
                                        GERSHWIN A. DRAIN
                                        United States District Judge

## CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
April 15, 2020, by electronic and/or ordinary mail.
<u>/s/ Teresa McGovern</u>
Case Manager